UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| ALLEN E. MONDAY | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 3:02-cv-556 |
| | ) | 3:98-cr-038 |
| | ) | *Jarvis* |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

**<u>MEMORANDUM</u>**

This is a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 filed by petitioner Allen E. Monday ("Monday"). For the following reasons, the § 2255 motion will be **DENIED** and this action will be **DISMISSED**.

I.    <u>Standard of Review</u>

This court must vacate and set aside Monday's conviction upon a finding that "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255. To prevail under § 2255, Monday "must show a 'fundamental defect which inherently results in a complete miscarriage

of justice,' or, an error so egregious that it amounts to a violation of due process." *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1968)).

Under Rule 8 of the RULES GOVERNING SECTION 2255 PROCEEDINGS IN THE UNITED STATES DISTRICT COURTS, the court is to determine after a review of the answer and the records of the case whether an evidentiary hearing is required. If the motion to vacate, the answer and the records of the case show conclusively that Monday is not entitled to relief under § 2255, there is no need for an evidentiary hearing. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II.     Factual Background

Monday was convicted by a jury of being a felon in possession of a firearm and being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). He was sentenced, as an armed career criminal under 18 U.S.C. § 924(e), to concurrent terms of imprisonment of 262 months. The judgment was affirmed on direct appeal. *United States v. Monday*, No. 99-6678, 8 Fed.Appx. 394 (6th Cir. April 18, 2001), *cert. denied*, 534 U.S. 914 (2001). The Sixth Circuit summarized the evidence against Monday as follows:

2

## Facts

The following statements and testimony were elicited at trial.

### A.    Opening Statements

During opening statements, the prosecutor commented that "[t]his case is about why a previously convicted felon cannot have a firearm or ammunition." (J.A. at 32.) Defendant did not object to the prosecutor's comment. Rather, defense counsel countered by stating as follows in his opening statement:

> Ladies and gentlemen, this case is not about why a previously convicted felon cannot have a firearm. If you want to know why a previously convicted felon cannot have a firearm, I will read it to you. It's 18 USC § 922(g). "It shall be unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year to possess in or affecting commerce any firearm or ammunition." That is why a previously convicted felon cannot have a firearm, because it is against the law. This case is not about that. This case is about whether a previously convicted felon, my client, possessed the Rossi .38 that my learned adversary has told you about and the ammunition along with it on or about September 30, 1996.

(J.A. at 38-39.)

### B.    Government's Witnesses

#### a.    Officer Larry Murrell

At about 2:55 a.m. on Monday, September 30, 1996, Officer Larry Murrell of the Knoxville Police Department responded to a "[w]oman lying in the hallway" call on the fourth floor of the Parkway Hotel ("the Hotel") in Knoxville, Tennessee. (J.A. at 40.) Upon arriving at the scene. Officer Murrell found a white female lying in a pool of blood; the paramedics had just arrived and had not yet attempted to revive the woman. The Hotel offers apartments for rent, and upon viewing the scene, Officer Murrell observed "a trail of blood coming from apartment 400 where someone had drug her out." (J.A. at 42.) At this point of Officer Murrell's testimony, defense counsel objected on the basis that this testimony was not relevant to the charge of being a felon in

possession of a gun. The district court overruled defense counsel's objection, opining as follows:

> Counsel, I am not sure [what this has to do with the charge.] I assume that this proof is being introduced to somehow tie this particular individual to the defendant. I don't know just, not knowing any more about the facts than what I have already heard here, that is it. If it turns out this is not relevant, I will sustain your objection. At this point I can't, I will overrule it.

(J.A. at 42.) Officer Murrell waited for his partner, Officer Cathy Pappas to arrive; upon her arrival, Officer Murrell knocked on the door of apartment 400 and Jack Monday, Defendant's brother, answered. Upon doing so, Officer Murrell noticed that no one else was in the apartment with Monday; however, Murrell also noticed that there was blood all over the living room and a live . 38 caliber bullet on the floor.

### b.      Officer Cathy Pappas

Officer Pappas testified that she arrived on the scene shortly after Officer Murrell in response to an "injured person call;" and that upon arriving she noticed the paramedics, who by this time were "working on" a white female who was lying on the floor in the hallway. (J.A. at 46.) Officer Pappas also testified as to the trail of blood that she observed from the body leading to apartment 400. Officer Pappas corroborated Officer Murrell's rendition of what happened after Murrell knocked on the door of the apartment, while noting that what was later determined to be blood and gray matter were found on the floor of the apartment. The officers advised Monday that there was someone in the hall that had been hurt, to which Monday inquired as to "how bad she had been shot." (J.A. at 48.) Officer Pappas added that Monday was handcuffed and placed under arrest at this time. Pappas stated on cross-examination that no gun was recovered from the apartment.

### c.      Lieutenant Gordon Catlett

Lieutenant Catlett testified that he went to the scene after hearing that two of his officers, Murrell and Pappas, had responded to a call regarding an injured person at the Parkway Hotel. Upon arriving at the scene, Lieutenant Catlett observed "a white female victim laying in the hallway [with] blood all around her. She had suffered a single shot wound to the head...." Catlett also testified that he observed "blood in a smear mark in the hallway ... coming from the apartment ... almost indicat[ing] that her body had been drug from

that apartment to where she ended up laying in the hallway." (J.A. at 52.) Catlett soon realized that the woman was deceased.

Catlett remained with the body while Murrell and Pappas talked to Monday; Catlett soon heard someone "clomping" down the hall who later turned out to be Defendant. Defendant was wearing cowboy boots, blue jeans, no shirt, and was carrying a can of Coke in his hand. According to Catlett, Defendant walked up to him and said, "well, here I am." (J.A. at 55.) When Catlett asked Defendant what he knew about the incident, Defendant replied, "she shot herself." (J.A. at 55.) Lieutenant Catlett testified that he then asked Defendant if he knew where the gun was, because "[a]t that time we [the police] did not know where the murder weapon was." (J.A. at 55 .) Defense counsel objected to Catlett's remarks stating that "I object to that answer. This is not a murder trial. This is a gun possession trial. The indictment does not charge murder." (J.A. at 55.) The district court overruled the objection, opining as follows:

> It isn't a murder case. That is true. These are circumstances surrounding a situation that I assume are relevant. I am going to overrule. The jury will have to decide how relevant they are. They do have some relevance because your client was there and he was discussing it with the police officers. I overrule your objection.

(J.A. at 55-56.) Lieutenant Catlett then relayed the following conversation that he had with Defendant:

> Anyway, I said, like I said, where is the gun. He said, well, it is in her hand. Well, I knew that wasn't true because she didn't have anything in her hands. I said, well she doesn't have it in her hand. He said, well, it is in her boot. I said, she is wearing tennis shoes. Then he said, well, it is under her. I said the paramedics have moved her to check her. At that time I knew he had some involvement in the homicide. I knew something that he wasn't telling me. I told him to put his hands on the wall because I was going to pat him down and take him into investigative custody.

(J.A. at 56.) Catlett instructed Defendant to put his hands on the wall so that Catlett could do a pat down and take Defendant into custody. In the process of doing the pat down search, Catlett noticed that Defendant had a blood stain on the crease of his wrist and claw marks on his back and his arm, as if someone had been trying to fend him off. The Lieutenant claimed that at that

point Defendant became a homicide suspect, so the Lieutenant stopped asking him questions and handcuffed Defendant.

Defendant was transported to the police station and Catlett remained on the scene to look for the gun. Lieutenant Catlett noticed an open bedroom window without a screen in apartment 400. Because the window was open, the Lieutenant thought that the gun may have been thrown out of the window, so he went down the stairs and found a .38 caliber revolver on the pavement below the window. Catlett testified that it struck him odd that the gun did not have any grips on it, so he looked around and found the grips lying in the immediate area. Catlett concluded that the impact from the gun hitting the pavement from the fourth floor forced the grips to splatter off. Lieutenant Catlett left the gun where he found it and waited for the criminalistics officer, Dan Crenshaw, to arrive.

### d.    Officer Dan Crenshaw

Officer Crenshaw, senior evidence technician with the Knoxville Police Department, testified that he arrived on the scene at approximately 3:36 a.m. to collect evidence and to take pictures. Crenshaw stated that he confiscated the .38 caliber bullet found in apartment 400 as well as the .38 caliber Rossi revolver found outside the building. He later found and seized another live .38 caliber bullet from inside the living room couch. Crenshaw went to the morgue and recovered the slug taken from the victim's body, who by this time was identified as Beverly Reichenback.[1] (J.A. at 83-84.) Crenshaw testified that the gun was "fingerprinted," but that no fingerprints were found. (J.A. at 85.)

### e.    Investigator Tom Pressley

Investigator Pressley testified that he interviewed Defendant twice that day at the police station; one time at 6:03 a.m., and one time at 1:00 p.m. Defendant told Pressley that he resided at the Parkway Hotel in apartment 400. During the first interview, Defendant told Pressley that he had a .38 caliber five-shot Rossi and that he had gone practice shooting the day before the incident. (J.A. at 91-92.) During the second interview, Defendant stated that the deceased female "had gotten his gun out from under a stuffed dog and that

---

[1]Although Monday refers to the victim as Beverly Reichenbach, the trial transcript refers to her as Beverly Reichenback, and this court will likewise do so.

they were struggling for the gun and he ended up grabbing the gun away from her and it went off." (J.A. at 94.) Defendant told Pressley that at one time he had about thirty bullets for the gun, but that he only had about four bullets remaining which he kept under the stuffed dog along with the Rossi. Defendant also allegedly informed Pressley that he had acquired the Rossi by trading a Derringer for it. According to Pressley, Defendant stated that the victim found the gun on the day in question and was going to sell it for drugs. However, Pressley also noted that Defendant provided many renditions regarding the gun, claiming on one occasion that the weapon was a "community project" gun. (J.A. at 108.)

### f.    Officer Anders

Officer Anders videotaped Defendant three days after the shooting. At this time, Defendant claimed that he and his brother were inside apartment 400 when the victim was shot; Jack Monday (Defendant's brother) was asleep on the couch and the victim was seated next to Monday. Defendant claimed on the video that he noticed that the victim had his gun so "he reached and grabbed it and ... was standing in front of her ... and she grabbed his hand and during the struggle ... it fired." (J.A. at 114.) Defendant further claimed that he dragged the victim's body into the hallway in an attempt to get her to the hospital, but that she was too heavy for him to carry: therefore, Defendant laid her down and tried to give her CPR. He told Officer Anders that someone named "Jackie" had left the gun in his apartment a long time ago. Defendant further conveyed that he had shot the gun about ten to fifteen times while at a family farm about three days prior to the victim's death. Defendant admitted that he threw the gun out the bedroom window after the victim was shot.

### g.    Dr. Paul Googe

Dr. Googe, the medical doctor who performed the autopsy on the victim, testified that she died from a single gunshot wound to the head. Defense counsel objected to Dr. Googe's testifying as to the victim's age at the time of her death. However, the court allowed the Doctor to state that the victim was thirty-six years old inasmuch as the victim's age had already come into evidence.

## C.    Defendant's Witnesses

Defendant proffered three character witnesses who testified that Defendant was not known to possess firearms or ammunition. One of these character witnesses was Defendant's brother, Jack Monday, who testified that he lived in apartment 400 and that Defendant did not live in the apartment

with him. According to Monday, Defendant lived on the second floor of the Hotel with a woman named Anne Dolens, who was Defendant's girlfriend. Monday claimed that the victim owned the gun that killed her, and that he had been holding it for her for about six months. He added that the victim was a drug addict and that she had talked about killing herself.

Monday recounted that on the night before the shooting, he invited Defendant over to his apartment, and that he was asleep on the couch at the time that the victim was shot and did not awaken at the sound of the gunfire. However, Monday believed that the woman's death was a suicide.

### D.    Government's Rebuttal Witnesss [sic]

#### a.    Sheila Miller

The government called Sheila Miller in rebuttal who testified that she resided on the fourth floor of the Hotel, and that at the time of the shooting, Defendant lived in apartment 400. Miller claimed that she was in her apartment sleeping and was awakened by the sound of a female screaming and a gun going off. After the shooting, she heard a door open, a dragging sound, and then a man say "God damn, man, you didn't have to fucking shoot her." (J.A. at 212.) Thereafter, Miller heard rustling in the hall, people going down the back stairs, and then it got quiet. Miller stated that within seconds later, she observed a van speed out of the parking lot. (J.A. at 214.) A couple of days later, Miller stated that she heard Defendant convey to several people in the Hotel lobby that "ah, man, don't worry about me.... [T]hey are not going to nail me.... I did them a favor.... Just another whore off the street." (J.A. at 217-18.)

#### b.    Dr. Googe

During rebuttal, Dr. Googe testified that it was unlikely that the victim shot herself inasmuch as the wound appeared to be a "distant gunshot wound" because there was no sign of powder burns or other bullet fragments on the victim's forehead.

### E.    Jury Instruction

The district court provided the following charge to the jury, as agreed to by the parties:

> I caution you, members of the jury, that you are here to determine the guilt or innocence of the accused from the

evidence in this case. The defendant is not on trial for any act or conduct or offense not alleged in the indictment. Thus, you are not to concern yourselves with whether or not the defendant was criminally involved in the death of Beverly Reichenback [sic] because the defendant is not charged with that offense in this case.

(J.A. at 165; 28A.)

The jury found Defendant guilty on both counts of the indictment.

*United States v. Monday*, slip op. at 2-10, 8 Fed.Appx. at 395-99.

In support of his § 2255 motion, Monday alleges the following: (1) lack of federal court jurisdiction; (2) constructive amendment of the indictment; (3) prosecutorial misconduct; (4) ineffective assistance of counsel; and (5) improper sentence enhancement. The underlying premise for his allegations is that he was in effect prosecuted for the murder of Beverly Reichenback.

III.    Discussion

*A. Jurisdiction*

Monday claims the court lacked jurisdiction because the evidence failed to show a nexus with commerce. According to Monday, his possession of the firearm and ammunition did not affect interstate commerce. He also claims his attorney failed to raise this objection at trial or on direct appeal.

Monday primarily relies on the United States Supreme Court case of *United States v. Lopez*, 514 U.S. 549 (1995). Briefly, the statute at issue in *Lopez*, 18 U.S.C. § 922(q), had no requirement that the firearm possessed has traveled in interstate commerce. Thus, the Supreme Court found that this statue neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce. *Lopez*, 514 U.S. at 561-62. Without this necessary jurisdictional requirement, the Court held that the activity Congress sought to control (possession of firearms in school zones) was beyond the purview of Congress and thus unconstitutional. *Id*. at 562

Unlike the statute at issue in *Lopez*, section 922(g)(1) has the necessary jurisdictional requirement that the firearm possessed must have traveled in interstate commerce. Further, the phrase "affecting commerce" is a jurisdictional term of art that typically signals congressional intent to broadly exercise its commerce power as far as the Constitution permits. *United States v. Wallace*, 889 F.2d 580, 583 (5th Cir. 1989). All that is required is that an "appreciable amount" of interstate commerce be involved in the activity. *See Scarborough v. United States*, 431 U.S. 563, 577 (1977) ("there is no question that Congress intended no more than a minimal nexus requirement" between the possession of a firearm by a convicted felon and commerce).

Prior to trial, Monday stipulated that both the firearm and the ammunition were manufactured outside the State of Tennessee. That was sufficient to establish a connection to interstate commerce. *See United States v. Murphy*, 107 F.3d 1199, 1211 (6th Cir. 1997). "[U]nder the *Scarborough* minimal nexus test, 'proof that a firearm was manufactured outside the state in which the possession occurred is sufficient to support a finding that the

possession was in or affected interstate commerce.'" *Id.* (quoting *United States v. Vincent*, 20 F.3d 229, 236 (6th Cir. 1994)).  Thus, any objection to the court's jurisdiction would have lacked merit.

Monday's allegation of ineffective assistance of counsel on this issue also lacks merit. The failure of defense counsel to pursue frivolous motions and objections cannot constitute ineffective assistance of counsel. *United States v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990). Likewise, an attorney is not required to raise meritless issues on appeal. *Mathews v. United States*, 11 F.3d 583, 585 (6th Cir. 1993).

## B. Constructive Amendment

Monday claims that virtually all of the evidence at trial concerned the alleged murder of Beverly Reichenback, and not his possession of a firearm and ammunition. According to Monday, this variance between the trial proof and indictment created a constructive amendment to the indictment.

The Sixth Circuit has summarized the law on variance and constructive amendment as follows:

> The Fifth Amendment guarantees that an accused be tried only on those offenses presented in an indictment and returned by a grand jury. U.S. Const. amend. V; *Stirone v. United States*, 361 U.S. 212, 217-19, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). "[T]he constitutional rights of an accused are violated when a modification at trial acts to broaden the charge contained in an indictment." *United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir.1989). "A *variance* [to the indictment] occurs when 'the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.' In contrast, an amendment involves a change, whether literal or in effect, in the terms of the indictment." *United States v. Barrow*, 118 F.3d 482, 488 (6th Cir.1997) (emphasis added). "This Circuit has held that a variance rises to the level of a constructive amendment when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the

indictment." *Id.*; *see also United States v. Atisha*, 804 F.2d 920, 927 (6th Cir.1986) (explaining that a constructive amendment occurs when "there has been a modification at trial in the elements of the crime charged"). The defendant has the burden of proof on this issue. *Barrow*, 118 F.3d at 489.

　　　　While the distinction between a variance and a constructive amendment is sketchy, the consequences of each are significantly different. A variance will not constitute reversible error unless "substantial rights" of the defendant have been affected. *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir.1986). A constructive amendment, on the other hand, is "a variance that is accorded the per se prejudicial treatment of an amendment," because, like an actual amendment, it infringes upon the Fifth Amendment's grand jury guarantee. *See Ford*, 872 F.2d at 1235. Consequently, a constructive amendment warrants reversal of a conviction. *See id.* The defendant has the burden of proving that the variance in question rose to the level of a constructive amendment. *See United States v. Blandford*, 33 F.3d 685, 701 (6th Cir.), cert. denied, 514 U.S. 1095, 115 S.Ct. 1821, 131 L.Ed.2d 743 (1995).

*United States v. Chilingirian*, 280 F.3d 704, 711-12 (6th Cir. 2001).

　　　Monday was charged, in a two-count indictment, of being a felon in possession of a firearm (Count One) and of being a felon in possession of ammunition (Count Two), and was found guilty by a jury on both counts. On direct appeal, Monday alleged that the prosecutor's trial strategy, with respect to the testimony elicited, amounted to prosecutorial misconduct:

　　　　Defendant next argues that "the government attempted to try the case as a homicide trial, and said strategy amounted to prosecutorial misconduct to such an extent as to warrant a reversal of the conviction." In support of his claim Defendant relies upon those instances delineated in the statement of facts section of this opinion wherein Defendant objected to the prosecutor's elicitation of testimony which, according to Defendant, mischaracterized this case as one for murder. For example, Defendant claims that the prosecutor's question to Officer Murrell which elicited the testimony that Officer Murrell noticed a trail of blood from the victim's body to apartment 400, amounted to misconduct warranting reversal.

*United States v. Monday*, slip op. at 15, 8 Fed.Appx. at 402 (quoting Defendant's Brief on

Appeal at 12). As the Sixth Circuit noted,

> It appears that Defendant is actually attempting to argue that the prosecutor's framing of the case and elicitation of trial testimony was calculated to mislead the jury into believing that this was a murder trial--and more importantly that Defendant was the murderer--thereby resulting in prejudice warranting reversal of Defendant's conviction.

*Id.*, slip op. at 16, 8 Fed.Appx. at 402. The Sixth Circuit then rejected the claim of

prosecutorial misconduct:

> [A] prosecutor is not allowed to mislead the jury regarding the evidence or inferences that may be drawn therefrom. However, we do not believe that the prosecutor's questions to various witnesses as to matters such as the trail of blood leading from the victim to apartment 400 misled the jury. The prosecutor had to provide a background for the recovery of the weapon and ammunition, and had to link Defendant to these items in order to prove that Defendant was a felon in possession of a gun and ammunition. There was testimony that Defendant lived in apartment 400, that live .38 caliber bullets were found in apartment 400, that Defendant had traded a Derringer for the .38 Rossi, and that the victim died from a single gunshot wound to the head. Therefore, the prosecutor's attempt to link the body with apartment 400 did not mislead the jury as to the crimes for which Defendant was charged.
>
> We are not persuaded by Defendant's claim that testimony elicited by the prosecutor from Sheila Miller regarding statements she overheard such as a man's voice saying, "God damn. man. you didn't have to fucking shoot her," and Defendant commenting that "ah. man. don't worry about me.... [T]hey aren't going to nail me.... I did them a favor, just another whore off the street," misled the jury. Although it is true that these statements may have implicated Defendant as having shot the victim, they also imply that Defendant was in possession of a gun and ammunition which is the crime for which he was charged. In addition, where the evidence against Defendant was so overwhelming, the prosecutor's questions cannot be said to be so flagrant as to require reversal.
>
> Moreover, ... any possible prejudice was cured by the trial court's instruction to the jury wherein the court cautioned the jury that "Defendant is not on trial for any act or conduct or offense not alleged in the indictment." Therefore, the jury was instructed by implication that this was not a murder

trial and that Defendant was not on trial for murder; accordingly. Defendant's claim on this issue fails.

*Id.*, slip op. at 16-17, 8 Fed.Appx. at 402-03 (citations omitted) (footnote omitted).

For the same reasons that the Sixth Circuit rejected Monday's claim of prosecutorial misconduct, this court rejects his claim of constructive amendment to the indictment. The evidence presented at trial was necessary to link Monday with the firearm and ammunition and to prove he was in possession of those items. In addition, this court specifically instructed the jury that "you are not to concern yourselves with whether or not the defendant was criminally involved in the death of Beverly Reichenbach [sic] because the defendant is not charged with that offense in this case." *Id.*, slip op. at 10, 8 Fed.Appx. at 399. Monday has failed to carry his burden of proving constructive amendment of the indictment and thus that claim lacks merit.

## C. Prosecutorial Misconduct

Monday claims that the prosecutor made prejudicial and inflammatory statements during trial, that he knowingly used false testimony, and that the prosecutor submitted prejudicial and inflammatory evidence. As noted, the Sixth Circuit already rejected Monday's claim of prosecutorial misconduct. A petitioner cannot use a § 2255 proceeding to relitigate issues decided adversely to him on direct appeal. *See, e.g., DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996). Thus, this court will not consider Monday's allegations of prosecutorial misconduct.

### D. Ineffective Assistance of Counsel

Monday alleges his attorney rendered ineffective assistance of counsel and has enumerated eight examples of such ineffective assistance. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), Monday must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id*. at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Monday first claims his attorney failed to object to the following statement by the prosecution when submitting into evidence a bullet fragment during the testimony of Dr. Paul Googe, the pathologist who performed the autopsy on Ms. Reichenback: "Okay. Is that the way that looks, is that consistent with the type of slug that would be taken from Beverly Reichenback's skull during the performance of the autopsy?" [Criminal Action No. 3:98-cr-38, Court File No. 55, Excerpt of Proceedings, p. 92]. According to Monday, this statement was inflammatory, prejudicial, and irrelevant.

Monday's attorney had previously objected to evidence regarding the death of the victim and the court overruled the objections. For example, when counsel objected to testimony from Officer Murrell about a trail of blood coming from the apartment, the court stated "I assume that this proof is being introduced to somehow tie this particular individual to the defendant." [*Id*. at 14]. When counsel objected to Officer Catlett referring to the gun as a murder weapon, the court stated:

> It isn't a murder case. That is true. These are circumstances surround a situation that I assume are relevant. I am going to overrule. The jury will have to decide how relevant they are. They do have some relevance because your client was there and he was discussing it with the police officers.

[*Id*. at 27-28].

The court had thus determined that evidence regarding the murder of Beverly Reichenback was relevant, as did the Sixth Circuit in finding no prosecutorial misconduct. Accordingly, an objection by counsel to the admission of a bullet fragment would have been overruled and therefore counsel's failure to make the objection would not constitute ineffective assistance of counsel.

Monday next claims his attorney failed to object to the submission into evidence of a photograph of the bullet wound to Ms. Reichenback's forehead. The theory of the defense was that Ms. Reichenback was the owner of the firearm and that she committed suicide by shooting herself. Over defense counsel's objection, the court allowing into evidence, during the rebuttal testimony of Dr. Googe, a photograph of Ms. Reichenback's broken fingernails. The purpose of the photograph was to show that Ms. Reichenback did not shoot herself. The photograph of the bullet wound was also received into evidence to show that the wound was not self-inflicted. [*Id*. at 192-200]. Therefore, any objection by counsel would have been frivolous and failure to make the objection did not constitute ineffective assistance of counsel.

For his third example of ineffective assistance of counsel, Monday claims his attorney failed to file a motion to suppress Monday's statements to the police. There is nothing in the record to suggest that Monday's statement to the police were not knowing and voluntary. Accordingly, there was no basis upon which counsel could have filed a motion to suppress and his failure to do so did not constitute ineffective assistance of counsel.

Monday next claims it was error for his attorney to recommend signing the stipulation that the firearm and ammunition were manufactured outside the State of Tennessee. According to Monday, he did not know that the firearm had affected commerce and did not know that affecting commerce was a key element of the offense. The Sixth Circuit has noted, however, that "'the only knowledge required for a § 922(g) conviction is knowledge that the instrument possessed is a firearm.'" *United States v. Davis*, 27 Fed.Appx. 592, 600 (6th Cir. 2001) (quoting *United States v. Capps*, 77 F.3d 350, 352 (10th Cir. 1996)).

As noted earlier, the theory of the defense was that Ms. Reichenback, and not Monday, was the owner of the firearm. Given that, as well as the holding of the Sixth Circuit, whether Monday knew that the firearm had affected commerce was immaterial. Therefore, it was not ineffective assistance of counsel to recommend signing the stipulation. The government was still required to prove Monday possessed the firearm in question.

Monday claims as his fifth example of ineffective assistance of counsel that his attorney failed to impeach the false and inconsistent testimony of Sheila Miller by the use of her prior statements to the police. Ms. Miller testified at trial that she lived in apartment 404, one door down from Monday; that she had gone to bed that evening but was awakened by a woman's scream; that she heard two gun shots, then heard a door open and a dragging sound, and later the sound of glass breaking. [Criminal Action No. 3:98-cr-38, Court File No. 55, Excerpt of Proceedings, pp. 177, 183-185]. When she opened her door, Ms. Miller saw a body in the hallway and Monday standing near apartment 400 covered with blood. [*Id*. at 187]. Ms. Miller also testified that she was too afraid to tell the police anything that night and denied having seen or heard anything. [*Id*. at 188]. Defense counsel limited his cross-examination of Ms. Miller to asking how many shots she heard, whether she heard a sound of somebody being dragged, and whether Monday was wearing a shirt. [*Id*. at 191-92].

In a statement given to the police two days after the incident, Ms. Miller denied hearing any shots and denied waking up until Sharon Kent came to her apartment that night. [Exhibit 8 to Monday's § 2255 motion, copy of excerpt of interview of Sheila Louise Miller by Tom Pressley, pp. 22-23 of 24 pages]. Presumably, these are the inconsistent statements that Monday claims should have been used to impeach Ms. Miller. As noted, however, Ms.

Miller admitted on direct that she previously denied to the police knowing anything about the incident. Given her other testimony on direct, it could be considered sound trial strategy to limit further testimony from Ms. Miller. The court finds no evidence of ineffective assistance in this regard.

In his last three claims, Monday complains, respectively, that his attorney failed to object at sentencing to the use of his 1977 conviction as a predicate offense for sentencing as an armed career criminal, failed to object to the use of his 1983 convictions as predicate offenses for sentencing as an armed career criminal, and failed to object to the enhancement for use of the firearm in a crime of violence. The court has determined in the next section of this opinion, *infra*, that Monday was properly sentenced. Accordingly, any objections by counsel would have been frivolous and thus his failure to object did not constitute ineffective assistance of counsel.

Based upon the foregoing, Monday has failed to demonstrate ineffective assistance of counsel under the standard established by the Supreme Court in *Strickland*.

### E. Sentence Enhancement

Monday claims he was improperly sentenced as an armed career criminal. The law provides a minimum mandatory sentence of fifteen (15) years for a person convicted of violating 18 U.S.C. § 922(g) who has three prior convictions for a violent felony or serious drug offense. 18 U.S.C. § 924(e)(1). A serious drug offense under state law is one "involving manufacturing, distributing, or possessing with intent to manufacture or distribute

a controlled substance ..., for which a maximum term of imprisonment of ten years or more is prescribed by law." *Id*. § 924(e)(2)(A)(ii). A violent felony is "any crime punishable by imprisonment for a term exceeding one year," that (I) "has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." *Id*. § 924(e)(2)(B).

According to Monday, he did not have the requisite three prior convictions for a violent felony or serious drug offense. Monday specifically alleges that his 1977 conviction for second degree burglary was expunged from his record and thus could not count as a prior conviction, and that his two 1983 convictions for first degree burglary were not crimes of violence and, in any event, should have been counted as only one conviction.

As proof that his 1977 conviction was expunged, Monday offers a copy of a letter from Susan Wilder, with the State of Tennessee Board of Probation and Parole, in which she states that she could not locate his probation records because they had been purged since the charges were so old (exhibit 11), and a copy of a letter from Adrienne Simpson-Brown, Monday's U.S. Probation Officer, in which she states that she does not have a record of his discharge from probation (exhibit 12). A § 2255 movant has the burden of proving the substance of his allegations by a preponderance of the evidence and a district court is not required to hold an evidentiary hearing on the basis of conclusory allegations. *See, e.g., Ashley v. United States*, 17 Fed.Appx. 306, 308 (6th Cir. 2001); *Tucker v. United States*, 423 F.2d 655, 656 (6th Cir. 1970); *United States v. Orlando*, 327 F.2d 185, 188 (6th Cir. 1964);

Case 3:98-cr-00038-TAV-CCS   Document 82   Filed 06/21/06   Page 21 of 24   PageID #: 21

*Malone v. United States*, 299 F.2d 254, 255 (6th Cir. 1962). The letters offered by Monday fail to meet that burden of proof.

With respect to Monday's 1983 convictions for first degree burglary, burglary is defined as a "violent felony" for purposes of the armed career criminal act, 18 U.S.C. § 924(e)(2)(B)(ii), and thus Monday's convictions for burglary were properly used to enhance his sentence as an armed career criminal. *See Taylor v. United States*, 495 U.S. 575 (1990); *United States v. Anderson*, No. 95-5369, 1995 WL 712753 (6th Cir. December 1, 1995). In addition, the fact that Monday's burglary convictions resulted from a sting operation and that he was sentenced for both crimes at the same time did not mean that they should be counted as one conviction for purposes of 18 U.S.C. § 924(e). *See United States v. Carter*, 283 F.3d 755, 758 (6th Cir. 2002) ("The fact that judgment was pronounced on the same day with sentences to run concurrently, without more, does not establish that the offenses were consolidated".)

Monday also claims his sentence was improperly enhanced for using a firearm in connection with a crime of violence. Monday refers to the case of *United States v. Stubbs*, 279 F.3d 402 (6th Cir. 2002), which considered the application of the cross reference in U.S.S.G. § 2K2.1(c) when a defendant used a firearm in connection with the commission of another offense. Because Monday was sentenced as an armed career criminal, however, *Stubbs* and U.S.S.G. § 2K2.1 did not apply in his case and his sentence was properly enhanced pursuant to U.S.S.G. § 4B1.4(b)(3)(A).

To the extent Monday attempts to raise a claim under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Apprendi* does not apply retroactively to § 2255 motions. *See Goode v. United States*, 305 F.3d 378, 381 (6th Cir. 2002). In a supplement to the § 2255 motion, Monday refers to the U.S. Supreme Court decisions in *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005).

At this time, there is no reason to apply *Blakely* retroactively to a § 2255 motion such as petitioner's. *See, e.g., In Re Dean*, 375 F.3d 1287 (11th Cir. 2004). "No court has yet determined whether *Blakely* created a new rule of constitutional law made retroactive to cases on collateral review." *Id.* at 1290 (citation omitted). In addition, any claim pursuant to *Blakely* is now governed by the Supreme Court's intervening decision in *Booker*, which applied the reasoning in *Blakely* to the federal sentencing guidelines.

In *Booker*, the Court noted that its holding should be applied "to all cases on direct review." *United States v. Booker*, 543 U.S. at 268. The Court did not state that the holding should be applied retroactively on collateral review of cases in which the judgment has become final. In fact, the Court quoted *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987), for the proposition that "'a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases ... pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a "clear break" with the past.'" *Id.* The Sixth Circuit has, in fact, held that *Booker* "does not apply retroactively in collateral proceedings." *Humphress v. United States*, 398 F.3d 855, 860 (6th Cir.), *cert. denied*, 126 S. Ct. 199 (2005).

IV.     Conclusion

Monday is not entitled to relief under § 2255 and his motion to vacate, set aside or correct sentence will be **DENIED**. This action will be **DISMISSED**. In addition to the above, this court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. A certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253.

      **AN APPROPRIATE ORDER WILL ENTER.**

                               _____ s/ James H. Jarvis _____
                                 United States District Judge